UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

CHRISTINE FUNN, on behalf of her infant daughter
B.F.C.,

                                                    Plaintiff,

-against-

CITY OF NEW YORK, POLICE OFFICER LATOYA
PARADISE (Shield # 16498), POLICE OFFICERS JOHN
DOE ##1-10,

                                                   Defendants.

**COMPLAINT AND JURY DEMAND**

**Docket No.**

------------------------------------------------------------------------ x

Plaintiff Christine Funn, on behalf of her infant daughter B.F.C. and by her attorneys, Stoll, Glickman & Bellina, LLP, for her Complaint alleges as follows:

## PRELIMINARY STATEMENT

1. This is a civil rights action in which Plaintiff seeks relief through 42 U.S.C. § 1983 for the violation of her Fourth and Fourteenth Amendment rights in addition to violations of the laws and Constitution of the State of New York.

2. The claim arises from a March 13, 2015 incident in which Officers of the New York City Police Department ("NYPD"), acting under color of state law, intentionally and willfully subjected Plaintiff to, among other things, assault, battery, excessive force, false arrest, false imprisonment, and malicious prosecution.

3. Plaintiff seeks monetary damages (special, compensatory, and punitive) against Defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

4. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988 and the laws and Constitution of the State of New York.

5. The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

## VENUE

6. Venue is laid within the Eastern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claim occurred within the boundaries of the Eastern District.

## PARTIES

7. Plaintiff resided at all times here relevant in Kings County, City and State of New York. On March 13, 2015, Plaintiff was fifteen years old and a student enrolled in a New York City public school in Brooklyn, New York.

8. The City of New York ("City") is a municipal corporation organized under the laws of the State of New York. At all times relevant hereto, Defendant City, acting through the New York Police Department ("NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel. In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

9. Police Officer Latoya Paradise was, at all times here relevant, a police officer of the

NYPD, and as such was acting in the capacity of an agent, servant, and employee of the City of New York.  On information and belief, at all times relevant hereto, Officer Paradise was involved in the decision to arrest Plaintiff without probable cause and used excessive force against her.  Upon information and belief, Officer Paradise was under the command of NYPD Transit District 33 on the date of the incident.  She is sued in her individual capacity.

10. Police Officers John Doe ##1-10 ("John Doe Defendants") were, at all times here relevant, police officers of the NYPD, and as such were acting in the capacities of agents, servants, and employees of the City of New York. On information and belief, at all times relevant hereto, the John Doe Defendants were involved in the decision to arrest Plaintiff without probable cause and to use excessive force upon her, or failed to intervene in the actions of their fellow officers when they observed them arresting Plaintiff without probable cause and employing excessive force against her.  Upon information and belief, the John Doe Defendants were under the command of the NYPD Transit District 33on the date of the incident and are sued in their individual capacities.

11. At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## FACTUAL ALLEGATIONS

12. On March 13, 2015, at approximately 1:30 P.M., Plaintiff was in the Broadway Junction subway station in Brooklyn, NY, on her way home from school with several friends and classmates.  She was 15 years old at the time.

13. As Plaintiff was in the switching trains within the station, she learned that her cousin was being arrested near the turnstiles.  Plaintiff walked towards the turnstiles to find out what

3

was happening.

14. As she approached the turnstiles, Plaintiff saw her cousin in police custody, surrounded by several officers. Plaintiff, along with several other teenaged friends and classmates, exited the station, passing through a turnstile.

15. Plaintiff approached a uniformed police officer and asked what was going on. The officer informed her that she could not reveal that information and told Plaintiff to step back.

16. Plaintiff complied with the officer's order. She explained to the officer that she was the arrestee's cousin and asked for permission to call his mother. The officer granted her permission.

17. Meanwhile, another police officer, whose name is unknown to Plaintiff, instructed Plaintiff's friends and classmates to go back into the subway station. The officer said they did not need to swipe their MetroCards again, opened the emergency exit door for the teenagers, and instructed them to walk through.

18. Plaintiff's friends walked through the emergency exit door. Plaintiff remained in the vicinity of the arrest while she called her cousin's mother to inform her about the situation.

19. After she hung up the phone few moments later, Plaintiff walked toward the emergency exit door.

20. As Plaintiff approached the door, Defendant Officer Latoya Paradise walked behind her, grabbed the emergency exit door, and intentionally shut it against Plaintiff's back, neck, and head, causing pain to Plaintiff.

21. Officer Paradise then forcibly slammed Plaintiff's head into the metal door frame, grabbed Plaintiff's hair, pushed her, and said: "Pay your fare, bitch."

22. Several other officers, whose names are unknown to Plaintiff, tackled Plaintiff, threw

her to the ground, and arrested her.

23. Plaintiff was taken to Transit District 33, held for several hours, and released from police custody.

24. At all times during the events described above, the defendant police officers were engaged in a joint venture and formed an agreement to violate Plaintiff's rights. The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events. They failed to intervene in the obviously illegal actions of their fellow officers against Plaintiff.

25. During all of the events above described, defendants acted maliciously and with intent to injure Plaintiff.

## DAMAGES

26. As a direct and proximate result of the acts of defendants, Plaintiff suffered the following injuries and damages:

> a. Violation of her rights pursuant to the Fourth Amendment of the United States Constitution to be free from an unreasonable search and seizure of her person;
>
> b. Violation of her rights pursuant to the Fourteenth Amendment of the United States Constitution to due process;
>
> c. Physical pain and suffering;
>
> d. Emotional trauma and suffering, including fear, embarrassment, humiliation, harassment, emotional distress, frustration, extreme inconvenience, anxiety; and
>
> e. Loss of liberty.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983
FALSE ARREST

27. The above paragraphs are here incorporated by reference.

28. The officer defendants wrongfully and illegally arrested, detained, and imprisoned Plaintiff, and failed to intervene in each other's obviously illegal actions.

29. The wrongful, unjustifiable, and unlawful apprehension, arrest, detention, and imprisonment of Plaintiff was carried out without a valid warrant, without Plaintiff's consent, and without probable cause or reasonable suspicion.

30. All of this occurred without any illegal conduct by Plaintiff.

31. No criminal charges were filed against Plaintiff.

32. The officer defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment as NYPD officers. Said acts by officer defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly and with the specific intent to deprive Plaintiff of her constitutional rights secured by the United States Constitution.

33. As a direct and proximate result of the misconduct and the abuse of authority detailed above, Plaintiff sustained the damages described above.

## SECOND CAUSE OF ACTION
42 U.S.C. §1983
EXCESSIVE FORCE

34. The above paragraphs are here incorporated by reference.

35. By intentionally shutting a metal door on Plaintiff body, slamming Plaintiff's head into a metal door frame, pushing her, and tackling her, the officer defendants used excessive force

against Plaintiff, and failed to intervene in each other's obviously illegal actions.

36. Defendants' conduct deprived Plaintiff of her rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

37. As a direct and proximate result of the misconduct and the abuse of authority detailed above, Plaintiff sustained the damages described above.

### THIRD CAUSE OF ACTION
42 U.S.C. §1983
MUNICIPAL LIABILITY

38. The above paragraphs are here incorporated by reference.

39. The City is liable for the damages suffered by Plaintiff because, after learning of its employees' violations of New Yorkers' constitutional rights, the City has: failed to remedy the wrong; created policies or customs under which unconstitutional practices regularly occur and even thrive; and has been grossly negligent in managing subordinates who cause the unlawful events. The result of the City's inaction is a culture within the NYPD where the same officers, the same units, and the same precincts repeatedly and routinely engage in acts of misconduct. By failing to properly train, supervise, and discipline its employees, agents, and servants, the City effectively encourages illegal, immoral, and unprofessional behavior.

40. The City has been aware for some time – from civil rights lawsuits, Notices of Claim, complaints filed with the Civilian Complaint Review Board ("CCRB"), City Council hearings, newspaper reports, criminal cases resulting in declined prosecutions and dismissals, and judicial rulings suppressing evidence and finding officers incredible as a matter of law – that a disturbing number of NYPD officers unlawfully search and seize New Yorkers without probable cause,

bring charges against New Yorkers with no legal basis, perjure themselves in charging instruments and through testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers.

41. Despite having acquired such knowledge, the City has refused to appropriately sanction its employees' illegal behavior.

42. The City's deliberate indifference to civil rights violations committed by individual police officers, as well as patterns of misconduct committed by the same officers or occurring in the same precinct has caused the constitutional violations against Plaintiff in this case.

**THE CITY FAILS TO TRACK CIVIL RIGHTS LAWSUITS, THEREBY SEVERING ANY POTENTIAL DETERRENT VALUE**

43. For decades, the City has been on notice that certain officers and precincts are disproportionately responsibility for civil rights lawsuit liability. Nonetheless, the City has failed to take action to hold officers or precincts accountable.

44. In 1999, Comptroller Alan Hevesi, in a memo to Police Commissioner Howard Safir, stated that there was "a total disconnect" between the settlements of civil claims – even substantial ones – and NYPD discipline of officers.[1] Hevesi continued:

> As a result, the NYPD does not learn of potential problem officers, fails to take curative action, and not infrequently fosters a situation in which an officer will engage in another act of violation, resulting in harm to another person and further damages from the City. More important, study of a large number of cases might well reveal patterns of misconduct against which the NYPD could and should take systematic management action.[2]

45. The Comptroller recommended that the police department "analyze . . . settled claims,

---

[1] *Id*.

[2] *Id*.

and take steps to review the officers' performance and propensity to commit acts of excessive force."[3]

46.     The City has not heeded Hevesi's advice, and the "total disconnect" remains fully in place today. The number of claims against the NYPD has doubled in recent years, costing taxpayers more than $1 billion.[4]

47.     Yet the City continues to resist attempts to catalog even the most basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD. Although certain police officers, units, and precincts have been found to have violated New Yorkers' constitutional rights *repeatedly*, the City refuses to track the data, or even to use the data it already has.[5]

48.     Courts – including this nation's highest court – assume that civil rights lawsuits deter police misconduct. *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to

---

[3] *Id*.

[4] *See* Barry Paddock, Rocco Parascandola, John Marzulli, & Dareh Gregorian, *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE (reporting that the number of claims against the NYPD doubled between 2004-2014, to a record high of 9,570 lawsuits filed in 2012, costing taxpayers nearly $1 billion); Colleen Long & Jennifer Peltz, Associated Press, *Nearly $1B in NYC police payouts*, Yahoo! News (October 14, 2010, 7:44 PM), http://news.yahoo.com/ap-investigation-nearly-1b-nyc-police-payouts.html (reporting that, in the decade ending in 2010, the City paid out nearly one billion dollars to resolve claims against the NYPD); Caroline Bankoff, *The City Has Paid Almost Half a Billion Dollars in NYPD-Related Settlements Over the Past 5 Years*, NYMag.com, Oct. 12, 2014, http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html (reporting that, between 2009-2014, New York City paid out more nearly $500 million to settle NYPD-related cases); see also City of New York, Office of the Comptroller Claims Report FY 2012, 30, June 4, 2013, https://www.documentcloud.org/documents/1375759-fy-2012-claims-report.html (noting that, in fiscal year 2012, so-called "police action claims," which are claims that result from false arrest or imprisonment, police shootings, excessive use of force, assault, or failure to protect, cost the City $64.4 million, and that in fiscal year 2011, the City paid out $60.2 million in police action claims).

[5] *See, e.g.*, Barry Paddock, et al., *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE ("The [Daily] News' investigation was centered around the results of a Freedom of Information Law request for a list of lawsuits filed against officers who have been sued 10 or more times over the past decade. The city Law Department provided the names of 51 officers and 463 cases. A News search found an additional 146 cases against the officers, and four other officers who should have been included in the response — calling into question the city's ability to track these cases.").

deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.") (citing *Carey v. Piphus,* 435 U.S. 247, 254-257 (1978)); *Hudson v. Michigan*, 547 U.S. 586, 598 (2006) ("As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts.") (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) and *Nix v. Williams,* 467 U.S. 431, 446, (1984)).

49. However, because the City of New York refuses to track civil rights lawsuits, such suits do not serve the deterrent purpose envisioned by the Supreme Court.

50. Civil rights lawsuits against NYPD officers have no impact on the officers' careers, regardless of the expense to the City to defend a police misconduct case, and even when the same officers are named in multiple lawsuits, because settlements of civil claims are ordinarily not even noted in an officer's personnel file.[6]

51. By failing to keep track of crucial data – which could save lives as well as taxpayer money – the City has created a system in which lawsuits are severed from any potential deterrent effect.

**THE CITY FAILS TO DISCIPLINE OFFICERS WHO COMMIT PERJURY AND FALSIFY OFFICIAL RECORDS**

52. The City is liable to Plaintiff for its failure to keep track of judicial decisions in suppression hearings where police officers have been found to have fabricated testimony.

53. There are hundreds of published decisions from the past several years in which judges in New York City courtrooms determine that, as a matter of law, police officers have testified incredibly, conducted illegal searches and seizures, and even suborned perjury.

---

[6] Association of the Bar of the City of New York, Committee on New York City Affairs, "The Failure of Civil Damages Claims to Modify Police Practices, and Recommendations for Change," March 2000, *available at* http://www2.nycbar.org/Publications/reports/print_report.php?rid=32.

54. Judicial decisions from suppression hearings and trials are particularly reliable indicators of a police officer's professional conduct and credibility because the testimony has been tested in open court, under oath.

55. Yet those in a position of authority – such as NYPD supervisors and prosecutors – have no procedure to notify individual officers or their supervisors of adverse judicial findings.

56. Without any notification, improper search and seizure practices and incredible testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored, and repeated misconduct by individual officers goes unaccounted for.

57. This has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal. As the Honorable Jack Weinstein, United States District Court Judge of the Eastern District of New York, has written:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

*Colon v. City of New York*, No. 09-CV-8, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009).

**THE CITY FAILS TO HOLD POLICE OFFICERS PERSONALLY FINANCIALLY LIABLE, RESULTING IN A COMPLETE LACK OF ACCOUNTABILITY**

58. The City of New York is also liable in this case because, by habitually indemnifying police officers who have acted unconstitutionally, the City isolates such officers from

11

accountability.[7] The effect – yet again – is that civil rights lawsuits do not serve a deterrent purpose. "It is almost axiomatic that the threat of damages has a deterrent effect, surely particularly so when the individual official faces personal financial liability." *Carlson v. Green*, 446 U.S. 14, 21, (1980) [emphasis added] (citing *Imbler v. Pachtman*, 424 U.S. 409, 442 (1976)) [footnote omitted].

**THE CITY HAS FAILED TO CREATE A MEANINGFUL POLICE OVERSIGHT AGENCY, THUS ALLOWING OFFICERS' UNLAWFUL BEHAVIOR TO GO UNCHECKED**

59. The City is liable because it has created a legal system in which officer misconduct routinely goes unpunished.

60. The City has purported to attempt to address police officers' abuse of authority, in part through the creation of the CCRB, a police oversight agency with investigative powers.

61. However, the CCRB has proved vastly inadequate.

62. First, the CCRB fails in its mission because it often has found that complainants "lack credibility" based on the fact that the complainant has also brought a civil rights lawsuit. The result is that the CCRB often fails to substantiate some of the most serious allegations.

63. Second, when the CCRB has determined that officers have made false statements to the CCRB in their own defense, the CCRB virtually never initiates its own findings against those dishonest officers. The same is true in situations where the CCRB finds that officers have failed to report their fellow officers' misconduct.

64. Third, because the CCRB's penalty recommendations are purely advisory and there is no enforcement mechanism, the recommendations have no binding effect on the NYPD or its

---

[7] *See* Eric Jaffe, *When Cops Violate Civil Rights, It's City Taxpayers Who Pay*, CITYLAB, Dec. 4, 2014, http://www.citylab.com/crime/2014/12/when-cops-violate-civil-rights-its-city-taxpayers-who-pay/383419/ (reporting that taxpayers almost always satisfy both compensatory and punitive damages awards entered against police officers).

officers. Even when the CCRB substantiates complaints, as it did in this case, the police department rarely imparts its own discipline on the officer.[8]

65. Fourth, the NYPD Department Advocate, which is endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized. Furthermore, in the rare event that the CCRB substantiates a complaint and the Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to reduce the discipline against such an officer, a power the commissioner has wielded.

66. The complaint procedure provides seemingly countless opportunities for City agencies to dismiss or disregard legitimate, credible complaints.

67. Due to the failures of the CCRB, many abuses of authority by police officers go unreported. Officers are thus free to abuse their authority with little or no fear of repercussions.

68. Here, the lack of accountability contributed to the defendant police officers' actions described above in that the officer defendants knew they were insulated from any repercussions for their unlawful actions against Plaintiff.

**THE CITY HAS ENCOURAGED UNCONSTITUTIONAL STOPS THROUGH ITS USE OF ARREST QUOTAS**

69. The City has also been alerted to the regular use of "Stop, Question, and Frisk" by its police officers, which disproportionately target people of color, despite the humiliation, inconvenience, and constitutional violations that the majority of law-abiding people, mostly in communities of color, suffer as a result.

---

[8] *See* Nathan Tempey, *CCRB: Cop Who Shoved Kid Through Hookah Bar Window Used Excessive Force*, gothamist, July 28, 2015, http://gothamist.com/2015/07/28/bronx_hookah_window_ccrb.php (reporting that in 2014, the CCRB substantiated only 327 of nearly 5,000 complaints, and that the NYPD disciplined 10 2 officers in that same period. Of the officers disciplined, only 22 faced administrative charges); WNYC.org, *Police Punishment: CCRB vs NYPD*, http://project.wnyc.org/ccrb/ (last visited July 23, 2015) (reporting that, in 2012, police officers received no discipline in 104 cases (40.3%) of the substantiated complaints processed (258); in 2013, the NYPD dropped 28.3% of the substantiated complaints without any disciplinary action; in 2014, it dropped 24.5%).

70. Even as the use of "Stop, Question, and Frisk" has declined precipitously in recent years – in large part due to the federal class action lawsuit *Floyd, et al. v. City of New York, et al.*, 08-CV-1034 (SAS) – the police have continued to use the policing tactic in a severely racially disproportionate manner, and for the improper purpose of meeting "performance goals" (more commonly known as arrest quotas).

71. According to data collected by the New York Civil Liberties Union ("NYCLU"), in 2014, New Yorkers were stopped by the police 46,235 times. Of the people stopped: 38,051 were totally innocent of any crime (82%); 24,777 were Black (55%); 12,662 were Latino (29%); and 5,536 were white (12%).[9]

72. The City is also aware that the misconduct does not stop at the regular use of stop and frisks to violate the civil rights of innocent people. For example, the NYCLU reported that more than 85% of summonses for Open Container were given to Black and Latino New Yorkers, whereas white recipients made up merely 4%.[10] The grossly disproportionate issuance of summonses to New Yorkers of color led one Kings County judge to note that he could not recall ever having arraigned a white defendant on an open container charge.[11]

73. Police officers have repeatedly told New York City news investigations that their supervisors pressure them into reaching "performance goals," resulting in the violation of innocent New Yorker's civil rights.[12]

---

[9] *See* NYCLU, *Stop and Frisk Campaign: About the Issue*, http://www.nyclu.org/content/stop-and-frisk-data (last visited July 22, 2015).

[10] See NYCLU, *Testimony Before City Council Public Safety & Courts and Legal Services Committees On Summons Court Operations and Impact*, http://www.nyclu.org/content/testimony-city-council-public-safety-courts-and-legal-services-committees-summons-court-oper.

[11] *People v. Figueroa*, 36 Misc.3d 605, 608 (Kings Co. 2012).

[12] *See* Jim Hoffer, *NYPD Officer Claims Pressure to Make Arrests*, WABC News ( (Mar. 2, 2010, 10:37 PM), http://7online.com/archive/7305356/ and Jim Hoffer, *Kelly Responds to Our NYPD Quotas,* WABC News (May 25, 2010, 3:31 PM), http://7online.com/archive/7461355/.

74. The City's inability to prevent its officers from abusing the stop and frisk policy is emblematic of the City's continuing failures to exercise adequate control over the NYPD, and to prevent police officers from abusing their authority. Such failures have led to further abuse of authority by police officers, including the incident underlying Plaintiff's Complaint.

**DEFENDANT OFFICER'S PRIOR LAWSUIT HISTORY**

75. The City of New York knew or should have known of the defendant officer's propensity to engage in misconduct of the type alleged in this Complaint, specifically arresting New Yorkers without probable cause to believe they have committed a crime or engaged in any wrongdoing, and unlawfully assaulting and battering arrestees.

76. Specifically, the City of New York has been aware of claims of constitutional violations involving Defendant Officer Latoya Paradise, as documented in the following civil rights action filed against the City of New York and Officer Paradise:

   a. *Frank v. City of New York, et al.*, 07-CV-4245 (NGG) (RER) (Officer Paradise alleged to have falsely arrested, used excessive force on, and made false allegation against a woman in Brooklyn; case settled).

77. Upon information and belief, the City failed to impose any sanctions or punishment on Defendant as a result of these prior lawsuits, resulting in a total lack of accountability and instilling a belief in Defendant that there are no consequences for violating the civil rights of the people she is supposed to protect. That belief contributed to Defendant's conduct towards Plaintiff in the instant case.

78. The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights. Despite such notice, the City has failed to take corrective action. This failure and these policies caused the officers in the present case to violate Plaintiff's civil rights, without fear of reprisal.

79. Plaintiff has been damaged as a result of the City's deliberate indifference.

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, as follows:

A. In favor of Plaintiff in an amount to be determined by a jury for each of Plaintiff's causes of action;

B. Awarding Plaintiff punitive damages in an amount to be determined by a jury;

C. Awarding Plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D. Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury

DATED: March 3, 2016
Brooklyn, New York

Respectfully yours,

STOLL, GLICKMAN & BELLINA, LLP

_____
By: Amy E. Robinson
475 Atlantic Avenue, 3rd Floor
Brooklyn, NY 11217
(718) 852-3710
(718) 852-3586
arobinson@stollglickman.com
*Attorneys for Plaintiff*

TO:
City of New York
100 Church Street
New York, NY 10007

Officer Latoya Paradise, # 16498
Transit Borough Brooklyn
960 Carroll Street, 2nd Floor
Brooklyn NY 11205

16